# Exhibit "B"

LOAN AGREEMENT

AGREEMENT, dated this _____ day of April ___, 2009, but effective as of April 9, 2009, by and among **AREI COLONNADE 1, LLC**, a Delaware limited liability company, **AREI COLONNADE 2, LLC**, a Delaware limited liability company, **AREI COLONNADE 3, LLC**, a Delaware limited liability company, **AREI COLONNADE 4, LLC**, a Delaware limited liability company, **AREI COLONNADE 5, LLC**, a Delaware limited liability company, **AREI COLONNADE 6, LLC**, a Delaware limited liability company, **AREI COLONNADE 7, LLC**, a Delaware limited liability company, **AREI COLONNADE 8, LLC**, a Delaware limited liability company, **AREI COLONNADE 10, LLC**, a Delaware limited liability company, **AREI COLONNADE 11, LLC**, a Delaware limited liability company, **AREI COLONNADE 12, LLC**, a Delaware limited liability company, **AREI COLONNADE 13, LLC**, a Delaware limited liability company, **AREI COLONNADE 14, LLC**, a Delaware limited liability company, **AREI COLONNADE 15, LLC**, a Delaware limited liability company, **AREI COLONNADE 16, LLC**, a Delaware limited liability company, **AREI COLONNADE 18, LLC**, a Delaware limited liability company, **AREI COLONNADE 20, LLC**, a Delaware limited liability company, at their respective addresses set forth in Schedule "A" attached hereto (individually and collectively, "Co-Borrowers"), **COLONNADE   PROPERTY, LLC**, a Delaware limited liability company, with its principal office address at 300 Perkiomen Avenue, Schwenksville, Pennsylvania 19473 (the "Guarantor") and **NATIONAL PENN BANK,** 95 North Broad Street, Doylestown, Pennsylvania, 18901 (referred to herein as "Bank").  The parties hereto agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

Section 1.01.  Defined Terms.  In addition to the other terms defined elsewhere in this Agreement, the following terms have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa):

"Affiliate" shall have the meaning as defined in 11 U.S.C. Section 101, except that the term "debtor" therein shall be substituted by the term "Co-Borrower".

"Agreement" means this Loan Agreement, as amended, restated, supplemented, or modified from time to time.

"Bank" means National Penn Bank, unless the context indicates otherwise.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks in the Philadelphia area are authorized or required to close under the laws of the Commonwealth of Pennsylvania.

"Capitalized Lease Obligations" means any amount payable with respect to any lease of any tangible or intangible property (whether real, personal or mixed), however denoted, which either (1) is required by GAAP to be reflected as a liability on the face of the balance sheet of the lessee, or (2) based on actual circumstances existing and ascertainable either at the commencement of the term of such lease or at any subsequent time at which any property becomes subject thereto, can reasonably be anticipated to impose on such lessee substantially the same economic risks and burdens, having regard to such lessee's obligations and the lessor's rights under the lease both during and at the termination of the lease, as would be imposed on the lessee by any lease which is required to be so reflected on the balance sheet of the lessee or by the ownership of the leased property.

"Co-Borrower(s)" means, individually and collectively, as the context may require, AREI

1

COLONNADE 1, LLC, a Delaware limited liability company, AREI COLONNADE 2, LLC, a Delaware limited liability company, AREI COLONNADE 3, LLC, a Delaware limited liability company, AREI COLONNADE 4, LLC, a Delaware limited liability company, AREI COLONNADE 5, LLC, a Delaware limited liability company, AREI COLONNADE 6, LLC, a Delaware limited liability company, AREI COLONNADE 7, LLC, a Delaware limited liability company, AREI COLONNADE 8, LLC, a Delaware limited liability company, AREI COLONNADE 10, LLC, a Delaware limited liability company, AREI COLONNADE 11, LLC, a Delaware limited liability company, AREI COLONNADE 12, LLC, a Delaware limited liability company, AREI COLONNADE 13, LLC, a Delaware limited liability company, AREI COLONNADE 14, LLC, a Delaware limited liability company, AREI COLONNADE 15, LLC, a Delaware limited liability company, AREI COLONNADE 16, LLC, a Delaware limited liability company, AREI COLONNADE 18, LLC, a Delaware limited liability company and AREI COLONNADE 20, LLC, a Delaware limited liability company.

"Co-Borrowers' Limited Liability Company Agreements" means the Limited Liability Company Agreements for each or all of the Co-Borrowers, as the context may require, as thereafter amended, supplemented or extended.

"Collateral" means all property, which is subject or is to be subject to the Lien granted by the Security Agreement or the Mortgage, or both, as the context may require.

"Debt" means (1) indebtedness or liability for borrowed money or for the deferred purchase price of property or service; (2) obligations as lessee under Capitalized Lease obligations; (3) current liabilities in respect of unfunded vested benefits under any Plan; (4) obligations under letters of credit issued for the account of any Person; (5) all obligations arising under acceptance facilities; (6) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business), and other contingent obligations to purchase, to provide funds for payment, to supply funds to invest in any Person, or otherwise to assure a creditor against loss; and (7) obligations secured by any Lien on property owned by any Person, whether or not the obligations have been assumed.

"Default" means any of the events specified in Section 9.01, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Environmental Law(s)" individually and collectively means and includes all present and future laws and any amendments (whether common law, statute, rule, order, regulation or otherwise), permits, and other requirements or guidelines of governmental authorities applicable to the Mortgaged Premises and relating to the environment and environmental conditions or to any Hazardous Substance or Hazardous Substance Activity (including, without limitation, CERCLA, the Federal Resource Conservation and Recovery Act of 1976, *42 U.S.C. § 6901, et seq.*, the Hazardous Materials Transportation Act, *49 U.S.C. § 6901, et seq.*, the Federal Water Pollution Control Act, *33 U.S.C. § 1251, et seq.*, the Clean Air Act, *33 U.S.C. § 7401, et seq.*, the Clean Air Act, *42 U.S.C. § 7401, et seq.*, the Toxic Substances Control Act, *15 U.S.C. § § 2601-2629*, the Safe Drinking Water Act, *42 U.S.C. § 300f-300j*, the Emergency Planning and Community Right-To-Know Act, *42 U.S.C. § 1101, et seq.*, and any so-called "Super Fund" or "Super Lien" law, environmental laws administered by the Environmental Protection Agency, the Pennsylvania Solid Waste Management Act, 35 P.S. § 6018.101-108, the Pennsylvania Hazardous Sites Cleanup Act, *35 P.S. § § 6020.101, et seq.*, any similar state and local laws and regulations, all amendments thereto and all regulations, orders, decisions, and decrees now or hereafter promulgated thereunder).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations and published interpretations thereof.

"ERISA Affiliate" means any trade or business (whether or not incorporated) which together with the Co-Borrowers would be treated as a single employer under Section 4001 of ERISA.

"Event of Default" means any of the events specified in Section 9.01, provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Facility" means the senior living facility providing assisted living and memory care services, known as "Colonnade at Schwenksville," located at 300 Perkiomen Avenue, Schwenksville Borough, Montgomery County, Pennsylvania, together with all related site improvements, located on the Real Estate.

"GAAP" means generally accepted accounting principles in the United States.

"Guarantor" means Colonnade Property, LLC, a Delaware limited liability company.

"Guaranty Agreement" mean the Guaranty Agreement to be executed by the Guarantor under Section 4.01(6) of this Agreement.

"Hazardous Substance" means, at any time, (i) asbestos and any asbestos containing material and any substance that is then defined or listed in, or otherwise classified pursuant to, any Environmental Laws or any applicable laws or regulations as a "hazardous substance", "hazardous material", "hazardous waste", "infectious waste", "toxic substance", "toxic pollutant" or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, or "EP toxicity", (ii) any petroleum and drilling fluids, produced waters, and other wastes associated with the exploration, development or production of crude oil, natural gas, or geothermal resources and (iii) petroleum products, polychlorinated biphenyls, urea formaldehyde, radon gas, radioactive matter, and medical waste.

"Hazardous Substance Activity" means any actual use, packaging, labeling, treatment, leaching, spill, cleanup, storage, holding, existence, release, emission, discharge, generation, processing, abatement, removal, disposition, handling or transportation of any Hazardous Substance from, under, into or on the Real Estate, the Facility or surrounding property (but only concerning surrounding property to the extent of seepage, release, discharge, migration, disposal or other actions from the Mortgaged Premises to the surrounding property or from the surrounding property to the Real Estate or the Facility).

"Head Office" means the principal office of the Bank designated as such by Bank from time to time.

"Indebtedness" means (a) the $2,800,000.00 Loan and all interest, costs, fees and expenses accrued thereon or in connection therewith, and (b) all other indebtedness and obligations or undertakings now or hereafter owing by the Co-Borrowers or the Guarantor to the Bank under this Agreement or the Loan Documents, and (c) all liabilities and obligations of the Co-Borrowers or the Guarantor to the Bank of any nature (including any past, present or future advances, readvances, release of collections, substitutions, extensions, renewals, interest, late charges, penalties, overdrafts and fees of any and all types), whether such liabilities and obligations are primary or secondary, absolute or contingent, direct or indirect, sole, joint, several, or joint and several, voluntary or involuntary, similar or dissimilar, related or unrelated, matured or unmatured, now or hereafter existing, due or to become due, or held by the Bank for its own account or as agent for others, whether created directly or acquired by negotiation, assignment or otherwise.

"Lending Office" means the Lending Office of the Bank (or of an affiliate of the Bank) designated on the signature pages hereof or such other office of the Bank (or of an affiliate of the Bank) in the United States as the Bank may from time to time specify to the Co-Borrowers as the office at which their Loans are to be made and maintained.

"Lease(s)" mean any and all leases, subleases, residency agreements, occupancy agreements, service agreements, licenses, and agreements to let or use, whether oral or written, now or hereafter in

3

existence with respect to the Real Estate and the Facility or any part thereof, and all extensions or renewals thereof, including, without limitation, the Master Lease.

"Lien" means any mortgage, deed of trust, pledge, security interest, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), or preference, priority, or other security agreement or preferential arrangement, charge, or encumbrance of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction to evidence any of the foregoing).

"Loan(s)" means the $2,800,000.00 loan.

"Loan Document(s)" means all agreements, documents and instruments now or hereafter executed or delivered by the Co-Borrowers or the Guarantor (or any other Person or entity) to the Bank in connection with the Indebtedness, and includes (i) this Agreement, the Note, the Mortgage, the Guaranty Agreement, the Subordination Agreement and the Security Agreements, and (ii) all other agreements, documents, and instruments described in Article V of this Agreement.

"Management Agreement" means the written Management Agreement by and between LifeCare Holdings, LLC, a Pennsylvania limited liability company, as "Manager" and Guarantor as "Client", dated August 26, 2008, whereby Manager is appointed the manager of the Facility.

"Master Lease" means the written Master Lease Agreement by and between the Guarantor as "Master Lessee" and the Co-Borrowers as "Master Lessor", dated August 13, 2008, covering the use and occupancy of the Facility and the Real Estate, as amended.

"Mortgage" shall mean the mortgage described in Section 4.01 (3) of this Agreement.

"Note" shall mean the $2,800,000.00 Note.

"Person" means an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority, or other entity of whatever nature.

"Plan" means an employee welfare benefit plan as defined by ERISA.

"Real Estate" means the four (4) acres of land, more or less, known as 300 Perkiomen Avenue, Schwenksville Borough, Montgomery County, Pennsylvania, designated as Tax Parcel No. 20-00-00407-00-5 on which is located the Facility.

"Security Agreement-Borrower" means the Security Agreement to be delivered by the Co-Borrowers under Section 4.01(1) of this Agreement.

"Security Agreement-Guarantor" means the Security Agreement to be delivered by the Guarantor under Section 4.01(2) of this Agreement.

"Security Agreements" mean, collectively, the Security Agreement-Borrower and the Security Agreement-Guarantor.

"Subordination Agreement" means the Subordination and Attornment Agreement dated effective April 9, 2009 by and among Co-Borrowers, Guarantor and Bank concerning, among other things, the subordination of the Master Lease to the Mortgage.

4

"Subsidiary" means a corporation in which more than 50% of the issued and outstanding shares of stock having ordinary voting power (other than stock having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation is at the time owned, directly or indirectly, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries or both, by the Co-Borrowers.

"Tenants in Common Agreement" means the written Tenants in Common Agreement by and among the Co-Borrowers, as restated effective April 9, 2009.

Section 1.02.  Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP applied on a consistent basis, and all financial data submitted pursuant to this Agreement shall be prepared in accordance with such principles.

ARTICLE II

LOAN

Section 2.01.    The Loan.  Subject to the terms and conditions of this Agreement and the Loan Documents, the Bank shall provide to Co-Borrowers a term loan in the amount of Two Million Eight Hundred Thousand Dollars ($2,800,000.00) (the "Loan"), the proceeds of which shall be used by Co-Borrowers (i) to refinance and payoff in its entirety Co-Borrowers' existing first lien mortgage held by Capital Source Finance, LLC; (ii) to finance the conversion ("Conversion") of existing space to additional assisted living space and pay for the costs of any environmental monitoring and testing, and if necessary, remediation on the Real Estate ($325,000.00); and (iii) to pay the cost of closing up to $75,000.00.  Notwithstanding the aforesaid, the actual disbursement of Loan proceeds at the Loan closing shall be made in the following manner and in the following order:

(a)     First, a sum sufficient to pay off the existing first lien mortgage held by Capital Source Finance, LLC and fund any necessary escrows required by such lender shall be paid by Co-Borrowers.  Effective as of March 31, 2009 this amount was $2,300,327.34.

(b)     Second, all past due real estate and school taxes (for 2008) and the current real estate taxes (County and Borough for 2009) on the Real Estate will be paid in full by Co-Borrowers.

(c)     Third, the costs of closing (excluding the amounts due under subsection (b) above) shall be paid up to but not exceeding $75,000.

(d)     Fourth, the balance of the Loan proceeds remaining after payment of the aforesaid amounts shall be paid to and held in an escrow account ("Escrow Account") by Bank in accordance with the following:

(i)     The Escrow Account shall be in the name of the Co-Borrowers, however disbursements therefrom shall be under the sole and exclusive control of Bank.

(ii)     The Escrow Account shall be interest bearing.

(iii)     The Escrow Account shall be further allocated as follows: (A) the sum of $100,000 shall be segregated and held for application towards the cost of all monitoring, testing and, if necessary, remediation, being conducted by Liberty Environmental, Inc. on the REC (defined below) described in the Phase I Report (defined below) as the potential groundwater impacts from the removal of the unregulated No. 4 fuel oil underground storage tank from the western portion of the Real Estate (herein, the "Environmental Monitoring"); and (B) the balance shall be held for application towards the Conversion.

(iv)    Upon submission of invoices approved by Guarantor for the Environmental Monitoring, Bank shall tender payment of those approved invoices from the Escrow Account.

(v)    In addition, Bank shall, upon receipt of invoices and requests for payment from Guarantor, disburse from the portion of the Escrow Account held for the Conversion (excluding the $100,000 set aside to cover the Environmental Monitoring) those amounts necessary to cover the actual costs of the Conversion.

(vi)    The entire portion of the Escrow Account held for the Conversion shall be disbursed by Bank to or on behalf of Co-Borrowers as aforesaid.  If any amount remains after completion of the Conversion, such excess shall be paid to Co-Borrowers.

(vii)    Any funds remaining in the portion of the Escrow Account held for the Environmental Monitoring shall be disbursed to Co-Borrowers only upon receipt of a Release of Liability issued by the Pennsylvania Department of Environmental Protection under the voluntary clean-up program administered under the Pennsylvania Land Recycling and Environmental Remediation Standards Act, 35 P.S. Sections 6026.101 et. seq. ("Act 2").

Section 2.02.    The Note.  The Loan made by the Bank under this Agreement shall be evidenced by, and repaid with interest in accordance with, a single promissory note of the Co-Borrowers duly completed, in the principal amount of Two Million Eight Hundred Thousand Dollars ($2,800,000.00), dated the date of this Agreement, payable to the Bank (said promissory note, as it may be hereafter amended, renewed or extended, the "Note").

Section 2.03.    Interest.  Interest on the Loan shall accrue at a fixed rate of 6.25% per annum until the Maturity Date.

Section 2.04.    Payment Schedule.  Co-Borrowers shall repay the principal of the Loan in accordance with the Note.  If not sooner paid, the entire remaining principal balance outstanding and all accrued and unpaid interest of the Note shall be due and payable in full no later than April 1, 2014 (the "Maturity Date").

Section 2.05.    Late Fees.  If any payment of principal and/or interest under the Note is not received by the Bank within fifteen (15) days of its due date, the Bank may, without waiving or modifying any of its rights or remedies, assess a late charge, payable on demand, in an amount equal to of seven cents ($0.07) for each dollar which is so overdue, or $75.00 whichever is greater, for the purpose of defraying the expense incident to handling such delinquency.

Section 2.06.    Prepayment.  If the principal sum of the Loan or any portion thereof is prepaid as a result of the sale of the Real Estate to a third party or the refinancing of the Loan with another financial institution, Co-Borrowers shall pay a prepayment premium in accordance with the Note.

ARTICLE III

PROVISIONS APPLICABLE TO THE LOAN

Section 3.01    Method of Payment.  The Co-Borrowers and Guarantor shall make each payment of principal and interest on the Loan made under this Agreement and the Note, and all fees owing to Bank, on or before the date when due, in lawful money of the United States, to Bank at its Lending Office or other designated location in immediately available funds.  The Co-Borrowers and the Guarantor, by

execution of this Agreement, authorize the Bank to charge from time to time against any account of the Co-Borrowers or Guarantor with Bank any amount so due.  Co-Borrowers and Guarantor shall pay to Bank promptly such amounts as may be due if Co-Borrowers' or Guarantor's deposit account balances are insufficient.  Whenever any payment to be made under this Agreement or under the Note shall be stated to be due on a day, which is not a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of the payment of interest.

Section 3.02.   Security for the Loan.  As security for the Loan and for all amounts payable hereunder and under the Note as well as for all other existing and future liabilities, whether absolute or contingent, due or to become due of the Co-Borrowers to the Bank under any other loans or extensions of credit by the Bank to the Co-Borrowers, the Bank shall have a lien upon and security interest in, any balance belonging to Co-Borrowers or Guarantor or any deposit or other accounts with Bank and any other amounts which may be owing from time to time by Bank to Co-Borrowers or Guarantor.

ARTICLE IV

COLLATERAL AND OTHER SECURITY

Section 4.01.   Security for the Loan.  As security for the Loan and for all amounts payable hereunder and under the Note as well as for all other existing and future liabilities, whether absolute or contingent, due or to become due of the Co-Borrowers and the Guarantor to the Bank under any other loans or extensions of credit by the Bank to the Co-Borrowers, the Bank shall have valid liens on and security interests in all of the Collateral.  Without limiting the generality of the foregoing, the Co-Borrowers and Guarantor (where applicable) grant to the Bank, or where applicable, the Co-Borrowers and the Guarantor shall deliver to Bank:

(1)   A valid, perfected first lien on and security interest ("Security Agreement-Borrower") in the following Collateral:

(i)   All of the following personal property and fixtures of the Co-Borrowers: all of the Co-Borrowers' present and future machinery, equipment and accessions (including but not limited to furniture, fixtures, office equipment and accessories) necessary or incidental to the general operation and maintenance of the Facility, and all Leases, licenses and other rights of occupancy in which the Co-Borrowers now have or hereafter may acquire an interest, wherever located, as more fully described in and under the terms and conditions of the Mortgage.

(ii)   All proceeds and products of any of the foregoing, including insurance proceeds, and all replacements to any of the foregoing.

(2)   A valid, perfected first lien on and security interest ("Security Agreement-Guarantor") in the following Collateral:

(i)   All of the personal property and fixtures of Guarantor of every kind and nature, wherever located, whether now owned or hereafter acquired, including, without limitation, all accounts, including healthcare-insurance receivables, equipment, accessions, fixtures, inventory, chattel paper, instruments, investment property, documents, rights to proceeds under letters of credit, letter-of-credit rights, deposit accounts and general intangibles, including the rights and interests of the Debtor in the goods and services the sale or lease of which gave rise thereto, including returned and repossessed items as well as the proceeds of foregoing, including all cash, checks, credits, trade-ins, deposits, and balances resulting from any sale, assignment or any other transfer or disposition thereof.

(ii)   All proceeds and products of any of the foregoing, including insurance

7

proceeds, and all replacements to any of the foregoing.

(3)     A mortgage and security agreement ("Mortgage") in the amount of the Loan executed by the Co-Borrowers covering the Real Estate, the Facility, the improvements and all fixtures, machinery and equipment necessary or incidental to the general operation and maintenance thereof and all renewals and replacements thereof or additions thereto, and such other property as the Bank may reasonably require, all as is more specifically described in the Mortgage. The Mortgage shall be a first lien on a good and marketable fee simple title to the Real Estate, free and clear of all prior liens, restrictions, easements and other encumbrances and title objections except those approved by Bank.

(4)     An Agreement to Maintain Insurance, in form and content acceptable to Bank.

(5)     An Assignment ("Assignment of Rents") to Bank of Co-Borrowers' and Guarantor's rights under all existing and future rents, Leases, licenses and profits of the Real Estate, the Facility or any portion thereof, including, without limitation, the Master Lease.

(6)     An unconditional and unlimited Guaranty Agreement, in form and content acceptable to Bank, in its sole discretion, executed and delivered by the Guarantor.

(7)     An Environmental Indemnity Agreement ("Environmental Indemnity Agreement") in form and content acceptable to Bank, executed and delivered by the Co-Borrowers.

(8)     The Subordination Agreement in form and content acceptable to Bank executed and delivered by the parties thereto.

(9)     A Tenant Estoppel Certificate ("Estoppel Certificate") executed and delivered by the Guarantor to the Bank, in form and content acceptable to the Bank.

To the foregoing ends, contemporaneously with the execution and delivery of this Agreement, the Co-Borrowers shall execute and deliver to the Bank the Mortgage (which shall contain the Security Agreement-Borrower), the Assignment of Rents, the Environmental Indemnity Agreement, the Subordination Agreement, the Estoppel Certificate and other Loan Documents to which it is a party, and the Guarantor shall execute and deliver the Guaranty Agreement, the Security Agreement-Guarantor, the Subordination Agreement, the Estoppel Certificate and the Assignment of Rents.

Section 4.02.    Financing Statements, Etc.    The Co-Borrowers and the Guarantor shall join with the Bank in executing and delivering such financing statements ("UCC-1 Financing Statements"), continuation statements and lien instruments (in form and substance satisfactory to the Bank) as the Bank may specify, and shall pay the cost of filing the same in such public offices as the Bank may reasonably designate. Notwithstanding anything herein to the contrary, the Bank is authorized to file all necessary UCC-1 Financing Statements and continuation statements on behalf of the Co-Borrowers and the Guarantor, as applicable, without the signature of Co-Borrowers or Guarantor.

Section 4.03.    Insurance.    The Co-Borrowers and the Guarantor, as applicable, shall at all times maintain insurance, in form and amount consistent with industry practice and underwritten by financially sound and reputable insurers, reasonably acceptable to the Bank, insuring the Collateral against fire, physical damage with extended coverage, liability and such other hazards as may be commercially prudent in Co-Borrowers' and Guarantor's business. Each policy of insurance covering any portion of the Collateral shall (a) show the Bank's security interest in such a manner that all payments for damage or loss shall be paid directly to the Bank, reflecting the Bank as a Bank loss payee, subject to the provisions of Subsection 4 (u) of the Mortgage which are incorporated herein by reference and, notwithstanding anything herein to the contrary, shall control the use and disbursement of insurance proceeds in the event of a fire or other casualty loss to the Facility, and (b) provide that it shall not be terminated, reduced in amount, or otherwise materially changed, without at least thirty (30) days' prior written notice to the Bank.

Upon request by the Bank at any time but not more than once annually, and upon the execution of this Agreement, the Co-Borrowers and the Guarantor shall deliver to the Bank satisfactory evidence of compliance with this Section 4.03.  The amount of coverage for insurance required by this Section 4.03 shall at all times equal or exceed the greater of one hundred percent (100%) of the insurable value of the Real Estate or the Collateral, as applicable.

      Section 4.04.    Title Insurance.  Co-Borrowers shall provide to Bank, at Co-Borrowers' cost, a current ALTA title insurance policy issued by a title insurance company acceptable to Bank dated as of the date of closing, insuring the lien of the Mortgage as a first lien on the Real Estate, free and clear of all prior liens (including possible mechanics' liens), judgments and encumbrances, subject only to such title conditions as may have been approved in advance by the Bank and containing such endorsements as may be required by Bank in its sole discretion.  The title insurance policy shall contain Endorsements 100, 300 and 910.

ARTICLE V

CONDITIONS OF LENDING

      Section 5.01.    Documents.   As a condition precedent to the execution and delivery of this Agreement and the availability of the Loan, the Bank shall, except as noted, have received the following agreements, documents and instruments (in form and substance satisfactory to the Bank and its counsel):

      (A)    The Note, Mortgage, Assignment of Rents, Subordination Agreement, Environmental Indemnity Agreement, Estoppel Certificate and Guaranty Agreement.

      (B)    The Security Agreement-Guarantor and UCC-1 Financing Statements.

      (C)    Certified copies of resolutions of the Co-Borrowers and the Guarantor evidencing approval of and authorizing execution of this Agreement and the Loan Documents, and all other matters contemplated by this Agreement.

      (D)    Certified copies of the Certificates of Formation of the Co-Borrowers and the Guarantor, together with Subsistence Certificates issued by the State of Delaware.

      (E)    True and correct copies of the Co-Borrowers' Limited Liability Agreements and the Limited Liability Agreement of Guarantor.  Where a member of a Co-Borrower is a limited liability company or trust, certified copies of all formation documents for such member, provided that Bank will accept a Certification of Trust for a trust member of a Co-Borrower provided the form and content of that certification are acceptable to Bank.

      (F)    UCC, judgment, lien and tax lien searches with respect to the Co-Borrowers and Guarantor, in form and content satisfactory in all respects to the Bank, which searches shall reveal (without limiting the general nature of the foregoing) that the Bank will obtain a first priority security interest in all of the property set forth in the Security Agreements, upon execution of this Agreement and, as applicable, the filing of appropriate UCC-1 financing statements.

      (G)    The Agreement to Maintain Insurance and Certificates of Insurance in compliance with the requirements of this Agreement.

      (H)    Opinion of Co-Borrowers' and Guarantor's Counsel in form and content acceptable to the Bank.

      (I)    The unanimous written consent of the Co-Borrowers, signed by all Co-Borrowers

9

approving the Loan, as required by the Tenants In Common Agreement.

(J)     Such other agreements, documents or instruments as the Bank or its counsel may require to effectuate the purposes of this Agreement and the Loan Documents, including, without limitation, all insurance policies required under this Agreement.

(K)     Payment of loan origination fees of Twenty-Eight Thousand Dollars ($28,000.00) at or before the date of closing on the Loan, and payment of Bank's attorney's fees incurred in connection with the Loan.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES

The Co-Borrowers represent and warrant to the Bank that:

Section 6.01.   Organization, Good Standing and Due Qualification.   The Co-Borrowers are all limited liability companies duly formed, validly existing, and in good standing under the laws of the State of Delaware; have the power and authority to own their assets and to transact the business in which they are now engaged or proposed to be engaged; and, to the best of Co-Borrowers' knowledge, are duly qualified as a foreign company and in good standing under the laws of each other jurisdiction in which such qualification is required except where failure to so qualify would not have a material adverse effect.

Section 6.02.   Power and Authority.   The execution, delivery, and performance by the Co-Borrowers of the Loan Documents have been duly authorized by all necessary actions under the Co-Borrowers' Limited Liability Agreements and do not and will not (1) contravene each such company's Certificate of Formation or Limited Liability Agreement; (2) violate any provision of or cause or result in a breach of or constitute a default under any law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award presently in effect having applicability to such company; (3) cause or result in a breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which such company is a party or by which it or its properties may be bound or affected; or (4) cause or result in or require the creation or imposition of any Lien, upon or with respect to any of the properties now owned or hereafter acquired by such company except as contemplated by this Agreement.  Where a trust is a member of a Co-Borrower, the execution, delivery and performance by the Co-Borrower of the Loan Documents through the trust as member thereof is duly authorized by the trust, is in the exercise of a permitted power under the trust document and the trustees executing the Loan Documents as the member of a Co-Borrower are the designated trustees thereof.

Section 6.03.   Legally Enforceable Agreement.   This Agreement is, and each of the other Loan Documents when delivered under this Agreement will be, legal, valid and binding obligations of the Co-Borrowers or Guarantor, or both, enforceable against the Co-Borrowers, the Guarantor, or both, in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, and other similar laws affecting creditor's rights generally.

Section 6.04.     Financial Statements; Accuracy of Information.   All information, financial statements, exhibits and reports furnished by the Co-Borrowers to the Bank in connection with this Agreement and the borrowings contemplated hereby are, and all such information, financial statements, exhibits and reports hereafter furnished by the Co-Borrowers to the Bank will be presented fairly in every material respect on the date furnished to the Bank, and no such information, financial statements, exhibit or report contains or will contain any material misstatement of fact or omits or will omit to state a material fact or any fact necessary to make the statement contained therein not materially misleading.

Section 6.05.   Labor Disputes and Acts of God.   As of the date hereof, neither the business nor

the properties of any of the Co-Borrowers is affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance) materially and adversely affecting such business or properties or the operation of any of the Co-Borrowers.

Section 6.06.   Other Agreements.   None of the Co-Borrowers is a party to any indenture, loan or credit agreement, or to any lease or other agreement or instrument, or subject to any charter or company restriction which would have a material adverse effect on the business, properties, assets, operations, or conditions, financial or otherwise, of the Co-Borrowers or the ability of any of the Co-Borrowers to carry out their obligations under the Loan Documents to which they are a party.   None of the Co-Borrowers is in default in any respect in the performance, observance or fulfillment of any of the obligations, covenants, or conditions contained in any agreement or instrument material to its business to which it is a party.

Section 6.07.   Litigation.   There is no pending or, to the knowledge of the Co-Borrowers, threatened action or proceeding against any of the Co-Borrowers before any court, governmental agency, or arbitrator which may, in any one case or in the aggregate, materially adversely affect the financial condition, operations, properties, or business of any of the Co-Borrowers or the ability of the Co-Borrowers to perform their obligations under the Loan Documents to which they are a party.

Section 6.08.   No Defaults on Outstanding Judgments or Orders.   The Co-Borrowers have satisfied all material judgments and are not in default with respect to any judgment, writ, injunction, decree, rule or regulation of any court, arbitrator, or federal, state, municipal, or other governmental authority, commission, board, bureau, agency, or instrumentality, domestic or foreign which would have a material adverse effect.

Section 6.09.   Ownership and Liens.   The Co-Borrowers have title to, or valid leasehold interests in, all of their respective properties and assets, real and personal, (other than any properties or assets disposed of in the ordinary course of business), and none of the properties and assets owned by the Co-Borrowers is subject to any Lien, except for existing purchase money liens, liens in favor of Bank, or liens permitted hereby under Section 8.01.

Section 6.10.   ERISA.   The Co-Borrowers are in compliance in all material respects with all applicable provisions of ERISA.   Neither a Reportable Event nor a Prohibited Transaction has occurred and is continuing with respect to any Plan (as such terms are defined in ERISA); no notice of intent to terminate a Plan has been filed nor has any Plan been terminated; no circumstances exist which constitute grounds under Section 4042 of ERISA entitling the PBGC to institute proceedings to terminate, or appoint a trustee to administer a Plan, nor has the PBGC instituted any such proceedings; none of the Co-Borrowers nor any ERISA Affiliate has completely or partially withdrawn under Sections 4201 or 4204 of ERISA from a Multiemployer Plan; Co-Borrowers and each ERISA Affiliate are not subject to any minimum funding requirements under ERISA with respect to any of their Plans and none of the Co-Borrowers nor any ERISA Affiliate has incurred any liability to the PBGC under ERISA.

Section 6.11.   Operation of Business.   The Co-Borrowers and Guarantor possess all licenses, permits, franchises, patents, copyrights, trademarks, and trade names, or rights thereto, to conduct their business substantially as now conducted and as presently proposed to be conducted, and to their knowledge none of the Co-Borrowers nor the Guarantor is in violation of any valid rights of others with respect to any of the foregoing other than those which would not have a material adverse effect.

Section 6.12.   Taxes.   Each of the Co-Borrowers has filed all tax returns (federal, state and local) required to be filed and has paid all taxes, assessments, and governmental charges and levies thereon to be due, including interest and penalties, except the filing of tax returns or the payment of taxes, if any, being contested by any of the Co-Borrowers and disclosed to the Bank in writing.

Section 6.13.   Debt.   As of the date hereof, none of the Co-Borrowers is indebted under any credit

11

agreement, indenture, purchase agreement, guaranty, Capitalized Lease, or other investment, agreement or arrangement except as disclosed in the Co-Borrower's financial statements or as otherwise disclosed to the Bank in writing.

Section 6.14.    No Zoning Violations.    None of the Co-Borrowers has knowledge of any violation, nor is there any notice or other record of violation of any zoning, subdivision, environmental, building or other statute, ordinance, regulation, restrictive covenant or other restriction applicable to the Real Estate or the Facility except for violations, if any, which Co-Borrowers have disclosed to Bank and are proceeding in good faith to remove or correct.

Section 6.15.    No Liens on Real Estate.    There exist no liens, encumbrances or other charges against the Real Estate, the Facility or any property relating thereto, including statutory and other liens of mechanics, workmen, contractors, subcontractors, suppliers, taxing authorities and others, except for liens for taxes not yet due and the security interests created hereby and other interests granted to Bank.

Section 6.16.    No Contracts for Liens.    None of the Co-Borrowers has made a contract or arrangement of any kind, the performance of which by the other party thereto could give rise to a lien on the Real Estate or the Facility by operation of law or otherwise.

Section 6.17.    Environmental Representations.

(1)    To Co-Borrowers' knowledge, after due inquiry, no Hazardous Substances have been disposed of on or in, nor is any Hazardous Substance Activity occurring on or in the Real Estate through any means at any time prior to Co-Borrowers' ownership thereof and Co-Borrowers are aware of no condition on or affecting the Real Estate or any other property owned by Co-Borrowers which constitutes or might constitute an environmental health hazard, except for the Recognized Environmental Conditions ("REC's") set forth in the Phase I Environmental Assessment (herein the "Phase I Report") dated January 7, 2009, prepared for Bank by Liberty Environmental, Inc.

(2)    Co-Borrowers hereby represent and warrant that Co-Borrowers have substantially complied with, are currently in substantial compliance with, have not been charged with, have not received any notice of, and are not under investigation for the failure to substantially comply with any and all laws of any governmental body relating to environmental protection matters, and, specifically, those relating to Hazardous Substances and Hazardous Substance Activity.

(3)    Co-Borrowers covenant to the Bank that Co-Borrowers shall use all reasonable efforts to prevent the deposit, storage, emission, discharge or release by Co-Borrowers or any tenant of Co-Borrowers, including the Guarantor, of any Hazardous Substances on its properties unless such deposit, storage, emission, discharge or release is authorized by and in full compliance with a duly issued permit, license, authorization or other approval of a governmental body. Co-Borrowers and Guarantor shall notify Bank promptly of any Hazardous Substance Activity or any significant or material environmental event, circumstance or condition relating to the Facility and the Real Estate. Co-Borrowers hereby indemnify, defend and hold harmless Bank from and against any claim, demand, loss or liability, including, but not limited to, costs of remedial action, response costs, personal injury and property damage, directly or indirectly arising out of or attributable to the use, generation, deposit, storage, release, threatened release, discharge, disposal, burial, dumping, spilling, leaking or other presence of Hazardous Substances, or any Hazardous Substance Activity on, under or about the Real Estate.

(4)    If an Event of Default under this Agreement shall occur, then Co-Borrowers and Guarantor shall permit such visitation of such persons as the Bank may select in connection with the Bank's consideration of enforcement or preservation of rights under this Agreement, the Note or any related documents, to visit the Facility or the Real Estate and perform such reasonable environmental site investigations and assessments thereon for the purposes of determining whether there exists properties any environmental condition which could result in any liability, cost or expense to the

12

owner or occupier thereof relating to Hazardous Substances or Hazardous Substance Activity.   Co-Borrowers and Guarantor will supply to the Bank's representatives such historical and operational information, including the results of all samples sent for analysis, correspondence with governmental bodies and previous environmental audits or environmental reviews regarding the Facility or the Real Estate as are within its possession, custody or control or which are reasonably available to them and which may be reasonably requested by the Bank to facilitate Bank's assessment of any environmental violations on the properties of Co-Borrowers.

Section 6.18.    Storage Tanks.   To Co-Borrowers' knowledge, after due inquiry, except for the one (1) above ground fuel storage tank as disclosed in the Phase I Report, no storage tanks for gasoline, oil, diesel fuel or any other substance are now located on or in the Real Estate and will not be installed on or in the Real Estate during the term of the Loan.

Section 6.19    Survival of Representations.    All of the above representations and warranties shall survive the making of this Agreement and the issuance of the Note and Mortgage.

ARTICLE VII

AFFIRMATIVE COVENANTS

So long as the Note or any of the Indebtedness shall remain unpaid, whether absolute or contingent, are outstanding, or this Agreement shall remain in effect, the Co-Borrowers, or where applicable, Guarantor will:

Section 7.01.  Maintenance of Existence.  Preserve and maintain their existence as limited liability companies in good standing in the jurisdiction of their formation, and qualify and remain qualified as a foreign limited liability company in each jurisdiction in which such qualification is required except where failure to so qualify would not have a material adverse effect.

Section 7.02.  Maintenance of Records.  Keep accurate records and books of account subject to normal adjustments, in which complete entries will be made in accordance with past practices of Co-Borrowers, using sound accounting practices, consistently applied, reflecting all financial transactions of the Co-Borrowers.

Section 7.03.  Maintenance of Properties.  Subject to Section 8.05, maintain, keep and preserve all of their properties (tangible and intangible) necessary or useful in the proper conduct of their business in reasonably good working order and condition, ordinary wear and tear excepted.

Section 7.04.  Conduct of Business; Permits and Approvals; Compliance with Laws.  Continue to engage in a commercially reasonable manner in a business of the same general type as conducted, or to be conducted, by it on the date of this Agreement; maintain in full force and effect, its franchises, and all licenses, patents, trademarks, tradenames, contracts, permits, approvals and other rights necessary to the conduct of its business (except where the failure to maintain in full force and effect all such franchises, licenses, patents, trademarks, trade names, contracts, permits, approvals and any other rights would not have a material adverse effect on Co-Borrowers' financial condition, results of operations or business or Co-Borrowers' ability to perform their obligations hereunder); and comply in all respects with all applicable laws, rules, regulations and orders (except for such laws, rules, regulations and orders the violation of which would not, in the aggregate, have a material adverse effect on any Co-Borrowers' financial condition, results of operations or business or any Co-Borrowers' ability to perform their obligations hereunder).

Section 7.05.  Maintenance of Insurance.  Maintain insurance naming Bank as Loss Payee, in the amounts and covering such risks as set forth above, subject to the provisions of Subsection 4(u) of the

13

Mortgage which are incorporated herein by reference.

Section 7.06.  Payment of Debt; Payment of Taxes, Etc.  Promptly pay and discharge:

(1)      All of its Debt in accordance with the terms thereof;

(2)      All material taxes, assessments, and governmental charges or levies imposed upon it or upon its income and profits, upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become in default;

(3)      All lawful claims for labor, materials and supplies or otherwise, which, if unpaid, might become a lien or charge upon such property or any part thereof;

provided, however, that none of the Co-Borrowers shall be required to pay and discharge any such Debt, tax, assessment, charge, levy or claim so long as the failure to so pay or discharge does not constitute or result in a Default or an Event of Default under the Note and so long as no foreclosure, attachment, execution or other similar proceeding shall have been commenced against such property or any part thereof and so long as the validity thereof shall be contested in good faith by appropriate proceedings diligently pursued and it shall have set aside on its books adequate reserves with respect thereto.

Section 7.07.  Reporting Requirements.  Furnish to the Bank:

(1)      Within one hundred twenty (120) days after the close of each fiscal year of the Guarantor, financial statements of the Guarantor, including a balance sheet and related statements of income, all in reasonable detail, together with all supporting schedules and notes, if any, and prepared on a reviewed basis, in accordance with GAAP, by independent certified public accountants reasonably satisfactory to Bank.

(2)      Financial statements for the Guarantor will be required on a quarterly basis within thirty (30) days following the close of each calendar quarter.  The financial statements shall be management prepared in accordance with GAAP.

(3)      Certified rent rolls and occupancy reports shall be provided by the Guarantor on a quarterly basis within fifteen (15) days after the close of each calendar quarter and on an annual basis within sixty (60) days after the close of each fiscal year, all of which shall be prepared by management of the Guarantor, certified as true, correct and complete by such management's chief financial officer.

(4)      Upon request by Bank each Co-Borrower limited liability company which files a federal income tax return, or where applicable, each member of a Co-Borrower which files a federal income tax return or each grantor/settlor of a "Grantor" trust (as defined under the Internal Revenue Code) which is the sole member of a Co-Borrower limited liability company, shall deliver to Bank, by April 30 of each year, complete copies of their filed federal income tax returns, which shall be signed and certified by the applicable Co-Borrower/member/trust grantor to be true and complete copies of such returns.  If a Co-Borrower/member/trust grantor files a timely request for an extension of time to file a return and provides a copy of the grant of that extension to Bank, the due date for supplying the return shall be thirty (30) days after the return is filed provided the return is filed within the extension period.

(5)      By April 30 of each year the Guarantor shall deliver to Bank a complete copy of its filed federal income tax returns, which shall be signed and certified to be a true and complete copy of such return.  If the Guarantor files a timely request for an extension of time to file a return and provides a copy of the grant of that extension to Bank, the due date for supplying the return shall be thirty (30) days after the return is filed provided the return is filed within the extension period.

14

(6)      Such other information respecting the condition or operations, financial or otherwise, of the Co-Borrowers and the Guarantor as the Bank may from time to time reasonably request, including but not limited to financial projections and listing of assets.

Section 7.08      Maintenance of Satisfactory Financial Condition.  The  Co-Borrowers  and  the Guarantor shall maintain, in the reasonable judgment of the Bank, a satisfactory financial condition and shall notify the Bank promptly in writing of any adverse changes in their financial condition, operation or collateral as presented in the last submitted financial statement.  This would include the establishment of credit with another institution.

Section 7.09.  Further Assurances.  Do such further acts and things and execute and deliver to the Bank such additional assignments, agreements, powers and instruments, as the Bank may reasonably require or reasonably deem advisable to carry into effect the purposes of this Agreement or to better assure and confirm unto the Bank its rights, powers and remedies hereunder.

Section 7.10.  Cross-Default.  Covenant and agree that all existing and future loan obligations of Co-Borrowers and Guarantor to Bank shall be cross-defaulted.

Section 7.11.  Mechanic's Liens.  If any mechanic's lien shall be filed against the Real Estate or any interest therein by reason of work, labor, services or materials supplied or claimed to have been supplied, or any municipal liens or other liens or encumbrances, other than the Mortgage, or leases approved by the Bank, as hereinabove set forth, shall be recorded, filed or suffered to exist, and if any such mechanic's lien or other lien or encumbrance is not discharged or proceedings to discharge them have not been commenced by the Co-Borrowers within fifteen (15) days after the Co-Borrowers shall have been given notice by the Bank or by the claimant or otherwise of the filing or recording thereof, then the Bank may, at its option, pay and discharge the said lien or encumbrance, in which case the sum which the Bank shall have so paid shall be accepted by the Co-Borrowers as part of the advances then due or thereafter to become due, as the Bank may elect.  While any such lien or encumbrance remains of record, or while any petition against the Co-Borrowers as described below remains filed without having been withdrawn or dismissed, the Bank may withhold making any further advance hereunder and upon written notice from the Bank to the Co-Borrowers this shall constitute an event of default upon which the Bank may proceed as hereinafter provided.

Section 7.12.     No Change to Management Agreement. Neither Co-Borrowers nor Guarantor shall make any amendments, extensions, supplements or other modifications to the Management Agreement for the Facility without the prior written approval of the Bank, which approval shall not be unreasonably withheld or delayed.

Section 7.13.     Flood Plain.     If at any time the Real Estate is identified as being located in an area designated by an appropriate governmental body as subject to a flood hazard, the Co-Borrowers shall obtain flood insurance as provided in the National Flood Insurance Act of 1968, as amended.  If Co-Borrowers fail to obtain such insurance, it may be obtained by Bank and the cost thereof shall be payable by Co-Borrowers.  Failure of Co-Borrowers to pay for such insurance shall constitute an event of default hereunder.

Section 7.14.     Reporting Requirements as to Leases.  Copies of all existing Leases, including the Master Lease and all residential occupancy agreements, shall be provided to Bank on the date hereof. Copies of all future Leases, including any amendments to the Master Lease, if approved by Bank, shall be provided to Bank within thirty (30) days of execution.  Field audits may be performed periodically by Bank to compare the occupancy roll of the Facility with all actual Leases and residential occupancy agreements.

Section 7.15.     Banking Relationship. Although no compensating balances are required, an active deposit account relationship is to be maintained with the Bank during the term of the Loan.  This includes the

15

major business deposit accounts of Guarantor.

Section 7.16.   Business and Management Continuity.   Conduct its business and the business of Guarantor in substantially the same manner and locations as such business is now conducted, maintain executive management reasonably satisfactory to Bank and, if feasible, notify the Bank within five (5) Business Days prior to any change in the officers, directors or key management employees of Guarantor.

Section 7.17.   Financial Covenant.  Maintain a debt coverage ratio at a minimum of 1.2X measured annually.   The debt coverage ratio is calculated as follows:   The sum of net income, depreciation, amortization and interest expense, less withdrawals is divided by the sum of interest expense and all principal payments paid during the year being measured.

Section 7.18.   Condition of Real Estate and Facility.   Keep the Real Estate, the Facility and the improvements thereon in good condition, repair and order, ordinary wear and tear excepted, and make all necessary repairs to the improvements and replacements thereof so the operating efficiency and the value thereof shall at all times be preserved and maintained in all material respects.  Co-Borrowers and Guarantor shall permit Bank to inspect and examine the Real Estate, the Facility and all related improvements at any time upon reasonable advance notice.

Section 7.19.   Compliance with Laws Governing Foreign Assets Control.   (i) Ensure that no Person or entity who owns a controlling interest in or otherwise controls the Co-Borrowers or the Guarantor is or shall be listed on the Specially Designated Nationals or Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not use or permit the use of the proceeds of the Loan to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (iii) comply with all applicable Bank Secrecy Act laws and regulations, as amended.

Section 7.20.   Notice of Litigation.   Notify Bank, in writing, immediately of (i) the institution of any litigation; (ii) the commencement of any administrative proceedings; or, (iii) the happening of any event which would materially adversely affect the business operations or financial condition of Co-Borrowers or Guarantor or constitute a Default hereunder or under any of the Collateral security documents listed above.

Section 7.21.   Payment of Taxes.   Pay on or prior to the date when due (i) all undisputed taxes, assessments and other governmental charges or levies imposed upon Co-Borrowers or Guarantor or any of their respective properties or income; (ii) all undisputed lawful claims of material suppliers, mechanics, carriers, warehousemen, landlords and other like persons which, if unpaid, might result in the creation of a lien upon any of Co-Borrowers' or Guarantor's property; (iii) all undisputed other lawful claims which, if unpaid, might result in the creation of a lien upon any of Co-Borrowers' or Guarantor's property.

Section 7.22.   Maintenance of Government Licenses. Maintain all governmental consents, franchises, certificates, licenses, authorizations, approvals and permits, the lack of which would have a material adverse effect on Co-Borrowers or Guarantor, or the continued operation of the Facility.  Co-Borrowers and Guarantor shall remain in compliance with all applicable federal, state, local and foreign statutes, orders, regulations, rules and ordinances (including, without limitation, all laws, rules, regulations, order and decrees of the Department of Public Welfare, environmental laws and statutes, orders, regulations, rules and ordinances relating to taxes, employer and employee contributions and similar items, securities, ERISA, employee health and safety, or health and safety issues involving the occupants of the Facility) the failure with which to comply would have a material adverse effect on Co-Borrowers or Guarantor or the continued operation of the Facility.

Section 7.23.   Renovations and Improvements.   In connection with any renovations or improvements to the Facility, upon completion thereof Co-Borrowers and Guarantor shall provide to Bank a letter from the Architect, Floor Planner, Designer or Engineer responsible for the renovations or other improvements certifying that such completed work is in compliance with the Americans with Disabilities Act

(ADA).

Section 7.24    Tenants In Common Agreement.    In connection with the Tenants In Common Agreement the Co-Borrowers covenant and agree as follows:

(a)    That all of the Co-Borrowers, as parties to the Tenants In Common Agreement, waive their right to file a complaint or institute any proceeding at law or in equity to have the Real Estate or the Facility partitioned in accordance with applicable local law;

(b)    That all of the Co-Borrowers, as parties to the Tenants In Common Agreement, have consented and agreed to every restriction, provision, covenant, right and limitation contained in the Tenants In Common Agreement and the Master Lease.

(c)    That the Tenants In Common Agreement shall remain in full force and effect so long as the Indebtedness shall remain unpaid or this Agreement shall remain in effect, that none of the Co-Borrowers shall take any steps to terminate or invalidate the Tenants In Common Agreement and that no modification, supplement or restatement of the Tenants In Common Agreement shall be effective unless approved by Bank in writing prior to such modification, supplement or restatement.

ARTICLE VIII

NEGATIVE COVENANTS

So long as the Note or any of the Indebtedness shall remain unpaid, or this Agreement shall remain in effect, neither the Co-Borrowers nor the Guarantor will:

Section 8.01.  Liens.  Create, incur, assume, or suffer to exist, any Lien upon or with respect to any of its properties, now owned or hereafter acquired, except:

(1)    Liens in favor of the Bank;

(2)    Liens for taxes or assessments or other government charges or levies if not yet due and payable or, if due and payable, if they are being contested in good faith by appropriate proceedings promptly initiated and diligently conducted and for which appropriate reserves are maintained and so long as no foreclosure, distraint, sale or other similar proceedings shall have been commenced with respect thereto;

(3)    Liens, deposits, or pledges to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), leases (permitted under the terms of this Agreement), or public or statutory obligations; surety, indemnity, performance, or other similar bonds; or other similar obligations arising in the ordinary course of business.

(4)    Liens created and maintained in connection with the acquisition of assets, property or equipment after the date hereof, including Capitalized Leases, and attaching only to the assets, property or equipment being acquired and securing amounts not exceeding the purchase price.

Section 8.02.  Debt.  Create, incur, assume, or suffer to exist any Debt, except Debt of the Co-Borrowers or the Guarantor under this Agreement or the Note and except:

(1)    Accounts payable arising in the ordinary course of business.

(2)    Indebtedness hereafter incurred in connection with a Lien permitted in Section 8.01 above, including debt for Capitalized Leases.

17

(3)    Leases of equipment or vehicles from time to time by Guarantor used in the ordinary course of its business.

Section 8.03.    Mergers, Etc.    Merge or consolidate with, or sell, assign, lease, or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to any Person, or acquire all or substantially all of the assets or the business of any Person.

Section 8.04.    Dividends.    Declare or pay any dividends; or purchase, redeem, retire, or otherwise acquire for value any of its membership units now or hereafter outstanding; or make any distribution of assets to its members as such whether in cash, assets or obligations of the Co-Borrowers; or allocate or otherwise set apart any sum for the payment of any dividend or distribution on, or for the purchase, redemption, or retirement of, any units of membership; or make any other distribution by reduction of capital or otherwise in respect of membership units, if such dividend, unit purchase, or other action described in this paragraph would cause or result in the occurrence of an Event of Default as defined herein.

Section 8.05.    Sale of Assets.    Sell, lease, assign, transfer, or otherwise dispose of any of its now owned or hereafter acquired assets except: (a) for inventory disposed of in the ordinary course of business; (b) the sale or other disposition of assets no longer used or useful in the conduct of its business; and (c) the sale or other disposition of assets provided the proceeds of sale are used either to pay down the Loan owed by Co-Borrowers to Bank or to purchase substantially similar replacement assets.

Section 8.06.    Restrictions on Transfer of Real Estate and Facility.    Without the prior written consent of Bank, none of the Co-Borrowers will sell or transfer, or permit or suffer to be sold or transferred, voluntarily or by operation of law (other than by death or by execution on the Note or foreclosure on the Mortgage) all or any of their fee simple tenant-in-common interests in the Real Estate or the Facility.    Any consent of Bank to a sale or transfer of all or part of the interests of any of the Co-Borrowers in the Real Estate or Facility or an issuance or transfer of any limited liability interests or of any other interests in any of the Co-Borrowers shall pertain to the referenced sale, transfer or issuance only and shall not constitute, or obligate Bank to approve, any further sale, transfer or issuance or relieve any Person of any liability hereunder or under the Note. Any violation of or failure to comply with the provisions of this section shall constitute an immediate Event of Default hereunder and under the Note.

Section 8.07.    Guaranties, Etc.    Assume, guarantee, endorse, or otherwise be or become directly or contingently responsible or liable, (including, but not limited to, an agreement to purchase any obligation, stock, assets, goods, or services, or to supply or advance any funds, assets, goods, or services, or to maintain or cause such Person to maintain a minimum working capital or net worth, or otherwise to assure the creditors of any Person against loss) for obligations of any Person, except guaranties by endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business.

Section 8.08.    Hazardous Materials; Indemnification.    Use, generate, treat, store, dispose of or otherwise introduce any Hazardous Materials into or on any real property owned or leased by it, except in an environmentally safe manner through methods which have been approved by and meet all of the applicable standards of the federal Environmental Protection Agency and any other federal, state or local agency with authority to enforce Environmental Laws other than non-compliance which would not cause a material adverse effect.    The Co-Borrowers hereby agree to indemnify, reimburse, defend and hold harmless the Bank and its directors, officers, agents and employees ("Indemnified Parties") for, from and against all demands, liabilities, damages, costs, claims, suits, actions, legal or administrative proceedings, interest, losses, expenses and reasonable attorney's fees (including any such fees and expenses incurred in enforcing this indemnity) asserted against, imposed on or incurred by any of the Indemnified Parties, directly or indirectly pursuant to or in connection with the application of any Environmental Law to acts or

18

omissions occurring at any time on or in connection with any real estate owned or leased by the Co-Borrowers or any business conducted thereon.  None of the aforesaid shall in any way limit or restrict the right of Co-Borrowers to defend claims asserted against it or any of the Indemnified Parties.

ARTICLE IX

EVENTS OF DEFAULT; REMEDIES UPON DEFAULT

Section 9.01.  Events of Default; Remedies.  If any of the following events (each an "Event of Default") shall occur:

(1)    The Co-Borrowers shall fail to pay the principal of, or interest on, the Note or any other amount when due or declared due hereunder within fifteen (15) days of the date such amounts are due or declared due;

(2)    The Co-Borrowers or the Guarantor shall fail to comply with or perform when due any other term, obligation, covenant or condition contained in this Agreement or in any of the Loan Documents;

(3)    Any representation or warranty made by the Co-Borrowers or the Guarantor in this Agreement or which are contained in any certificate, document, opinion, or financial or other statement furnished at any time under or in connection with any Loan Documents shall prove to have been incorrect in any material respect on or as of the date made;

(4)    A default in the payment or performance of any obligation of the Co-Borrowers or the Guarantor to the Bank other than under this Agreement or the Note and such default shall have continued uncured after the giving of any required notice or past the expiration of any applicable grace or cure period;

(5)    A default occurs under any of the Loan Documents and such default shall have continued uncured after the giving of any required notice or past the expiration of any applicable grace or cure period;

Then, and in any such event, Bank may, upon notice to Co-Borrowers and Guarantor, terminate this Agreement, and declare all amounts outstanding under the Loan and all interest thereon and all other amounts payable under this Agreement to be immediately due and payable.  Thereupon Bank shall have all of the rights and remedies available to it under the Loan Documents or otherwise at law or in equity.  Except as otherwise provided herein, the Co-Borrowers and Guarantor expressly waive any presentment, demand, protest or further notice of any kind.

Notwithstanding the foregoing, if any Event of Default, other than a default in payment, is curable and if Co-Borrowers have not been given a notice of a breach of the same provision of the Note within the preceding twelve (12) months, it may be cured (and no Event of Default will have occurred) if Co-Borrowers, after receiving written notice from Bank demanding cure of such Default:  (a) cure the default within thirty (30) days; or (b) if the cure requires more than thirty (30) days, immediately initiate steps which Bank deems in Bank's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

Section 9.02    Remedies Cumulative.  The remedies provided in this Agreement shall be in addition to and not in substitution for the rights and remedies under the Note, Security Agreements, Mortgage, or Assignment of Rents, or which would otherwise be vested in the Bank in law or equity or as a secured party under the Uniform Commercial Code, all of which rights and remedies are specifically

19

reserved by the Bank, and the failure of the Bank to exercise any remedy herein provided or otherwise available to Bank shall not preclude the resort to any other appropriate remedy or remedies herein provided or otherwise available or prevent the subsequent or concurrent resort to any other remedy or remedies which by law or equity shall be vested in the Bank for the recovery of damages or otherwise in the event of a breach of any of the undertakings of the Co-Borrowers and Guarantor hereunder.

ARTICLE X

MISCELLANEOUS

Section 10.01.  Amendments, Etc.  No amendment, modification, termination, or waiver of any provision of any Loan Document to which the Co-Borrowers or the Guarantor are a party, nor consent to any departure by the Co-Borrowers or the Guarantor from any Loan Document to which they are a party, shall in any event be effective unless the same shall be in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

Section 10.02.  Notices, Etc.  All notices and other communications provided for under this Agreement and under the other Loan Documents to which the Co-Borrowers are a party shall be in writing (including telegraphic and telex transmissions and facsimile transmissions, if subject to pre-established verification procedures) and mailed or transmitted and delivered,

if to the Co-Borrowers, at:       the various addresses set forth in Schedule "A" hereto

with copy to:                     Jeffery J. Swanson, Esquire
                                  2515 Park Marina Drive, Ste. 102
                                  Redding, CA 96001
                                  Phone:  530-225-8773
                                  Fax:    530-232-2772


if to the Guarantor, at:          300 Perkiomen Avenue
                                  Schwenksville, Pennsylvania  19473

with copy to:                     Jeffery J. Swanson, Esquire
                                  2515 Park Marina Drive, Ste. 102
                                  Redding, CA 96001
                                  Phone:  530-225-8773
                                  Fax:    530-232-2772


if to the Bank, at:               National Penn Bank
                                  Attention: Jeffrey A. Glaush, Vice President
                                  95 North Broad Street
                                  Doylestown, PA  18901
                                  Direct: 215-230-6947
                                  Fax: 267-893-4785

20

with a copy to:            Stephen P. Moyer, Esquire
                           Grim, Biehn & Thatcher
                           P.O. Box 215
                           104 South Sixth Street
                           Perkasie, Pennsylvania 18944
                           Phone: 215-257-6811
                           Fax: 215-257-8092

or, as to each party, at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section 10.02. Except as otherwise provided in this Agreement all such notices and communications shall, when mailed or telegraphed, be effective when deposited in the mails or delivered to the telegraph company or sent, answerback received, respectively addressed as aforesaid, except that notices to the Bank and Co-Borrowers pursuant to the provisions of Article II shall not be effective until received by the applicable party.

Section 10.03. No Waiver; Remedies. No failure on the part of the Bank to exercise, and no delay in exercising, any right, power, or remedy under any Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Documents preclude any other or further exercise thereof or the exercise of any other right. The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law.

Section 10.04. Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Co-Borrowers, the Guarantor and the Bank and their respective successors and assigns, except that neither the Co-Borrowers nor the Guarantor may assign or transfer any of their rights under any Loan Document to which the Co-Borrowers or the Guarantor are a party without the prior written consent of the Bank.

Section 10.05. Costs, Expenses, and Taxes. The Co-Borrowers agree to pay (a) all costs and expenses in connection with the preparation, execution, delivery, filing, recording and administration of any of the Loan Documents including but not limited to the reasonable fees and out-of-pocket expenses of counsel for the Bank, and local counsel who may be retained by said counsel, with respect thereto and with respect to advising the Bank as to its rights and responsibilities under any of the Loan Documents; (b) costs of any inspection permitted or required under this Agreement or any of the Loan Documents; and (c) all costs and expenses, if any, in connection with the enforcement of any of the Loan Documents including but not limited to the reasonable fees and out-of-pocket expenses of counsel for the Bank and local counsel who may be retained by said counsel incurred by the Bank in connection with the enforcement and collection of the Loan and the Loan Documents and with respect to advising the Bank as to its rights and responsibilities under any of the Loan Documents. In addition, the Co-Borrowers shall pay any and all stamp and other taxes and fees payable or determined to be payable in connection with the execution, delivery, filing, and recording of any of the Loan Documents and the other documents to be delivered under any such Loan Documents, and agrees to save the Bank harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes and fees, so long as such delay or omission is not caused by Bank.

Section 10.06. Right of Setoff. If the unpaid principal amount of the Note, interest accrued on the unpaid principal amount or other amount owing by the Co-Borrowers under this Agreement, the Note or the other Loan Documents shall have become due and payable (at maturity, by acceleration or otherwise), the Bank is hereby authorized at any time and from time to time, without notice to the Co-Borrowers or Guarantor (any such notice being expressly waived by the Co-Borrowers and the Guarantor), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Bank to or for the credit or the account of the Co-Borrowers or the Guarantor against any and all of the obligations of the Co-Borrowers and the Guarantor now or hereafter existing under this Agreement or any of the Note or any other Loan Document, irrespective of whether or not the Bank shall have made any demand under this Agreement or the Note or

21

such other Loan Document and although such obligations may be unmatured. The Bank agrees promptly to notify the Co-Borrowers or the Guarantor, as applicable, after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Bank under this Section 10.06 are in addition to other rights and remedies (including, without limitation, other rights of setoff), which the Bank may have.

Section 10.07. Governing Law. This Agreement and the Note shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania.

Section 10.08. Severability of Provisions. Any provision of any Loan Document, which is prohibited or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 10.09. Survival of Agreement. All covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by the Bank of the Loan and the execution and delivery to the Bank of the Note and Loan Documents and shall continue in full force and effect so long as the Note or any amounts due hereunder are outstanding and unpaid.

Section 10.10. Headings. Article and Section headings in the Loan Documents are included in such Loan Documents for the convenience of reference only and shall not constitute a part of the applicable Loan Documents for any other purpose.

Section 10.11. Controlling Agreement. This Agreement shall be controlling, and take precedence over, the Note and Security Agreements, in the event of any inconsistency between the terms and provisions hereof and the terms and provisions of the Note or Security Agreements.

Section 10.12. JURISDICTION AND VENUE. IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER, THE BORROWER HEREBY IRREVOCABLY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN ANY COUNTY IN THE COMMONWEALTH OF PENNSYLVANIA WHERE THE BANK MAINTAINS AN OFFICE AND AGREES NOT TO RAISE ANY OBJECTION TO SUCH JURISDICTION OR TO THE LAYING OR MAINTAINING OF THE VENUE OF ANY SUCH PROCEEDING IN SUCH COUNTY. THE BORROWER AGREES THAT SERVICE OF PROCESS IN ANY SUCH PROCEEDING MAY BE DULY EFFECTED UPON IT BY MAILING A COPY THEREOF, BY REGISTERED MAIL, POSTAGE PREPAID, TO THE BORROWER.

Section 10.13. WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER (WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE) IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE BANK TO ENTER INTO THIS AGREEMENT.

Section 10.14. Confidentiality. Bank hereby agrees that all information, including financial information which is non-public, disclosed to Bank by Co-Borrowers or the Guarantor pursuant to this Agreement will be kept confidential and will not, without the prior written consent of Co-Borrowers, or the Guarantor, as applicable, be disclosed in any manner whatsoever, in whole or in part, except that Bank shall be permitted to disclose such information (i) to any regulatory agencies having jurisdiction over Bank in connection with their regulatory functions, (ii) as required by law or court order or in connection with any investigation or proceeding, and (iii) to Bank's auditors, accountants and attorneys. All obligations provided in this Section shall survive any termination of this Agreement and the repayment of the Loan.

IN WITNESS WHEREOF, INTENDING TO BE LEGALLY BOUND HEREBY, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

"Co-Borrowers"                              AREI COLONNADE 1, LLC,
                                            a Delaware Limited Liability Company,
                                            by its Sole Member,
                                            FREEDOM LAKES, LLC,
                                            a California Limited Liability Company,
                                            by its Sole Manager

                              By:    _____(SEAL)
                                     Name:  Gregory W. Holcomb
                                     Title:    Manager


STATE OF
                              ss:
COUNTY OF


        On this, the           day of                   , 2009, before me, a Notary Public in and for the
State of _____, the undersigned officer, personally appeared GREGORY
W. HOLCOMB, known to me (or satisfactorily proven) to be the individual whose name is subscribed to
the within instrument and acknowledged that he is the Manager of Freedom Lakes, LLC, a California
limited liability company, the sole member of AREI Colonnade 1, LLC, a Delaware limited liability
company, and that he, being authorized to do so, executed the foregoing instrument for the purposes
therein contained by signing the name of AREI Colonnade 1, LLC.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                              _____
                              NOTARY PUBLIC


[Signatures continued on next page]

23

AREI COLONNADE 2, LLC,
a Delaware Limited Liability Company
by its Sole Member,
THE SHIPLEY FAMILY 1995 REVOCABLE
TRUST DATED MAY 18, 1995

By: _____(SEAL)
Name:   Kenneth J. Shipley
Title:     Trustee

_____(SEAL)
Name:   Lora L. Shipley
Title:     Trustee

STATE OF

                                    ss:

COUNTY OF

     On this, the       day of       , 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared KENNETH J. SHIPLEY and LORA L. SHIPLEY, known to me (or satisfactorily proven) to be the individuals whose names are subscribed to the within instrument and acknowledged that they are the Trustees of The Shipley Family 1985 Revocable Trust dated May 18, 1995, the sole member of AREI Colonnade 2, LLC, a Delaware limited liability company, and that they, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 2, LLC.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[Signatures continued on next page]

24

AREI COLONNADE 3, LLC,
a Delaware Limited Liability Company,
by its Sole Member,
TRINITY OAKS, LLC,
a California Limited Liability Company
by its Sole Members

By: _____(SEAL)
        Name:  Gregory W. Holcomb
        Title:    Member

By: _____(SEAL)
        Name:  Ronald Charles Ball
        Title:    Member

STATE OF

                  ss:

COUNTY OF

      On this, the       day of            , 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared GREGORY W. HOLCOMB, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within instrument and acknowledged that he is one of the Members of Trinity Oaks, LLC, a California limited liability company, the sole member of AREI Colonnade 3, LLC, a Delaware limited liability company, and that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 3, LLC.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                          _____
                          NOTARY PUBLIC

[Notary Affidavit continued on next page]

STATE OF

                                         ss:

COUNTY OF

        On this, the _____ day of _____, 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared RONALD CHARLES BALL, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within instrument and acknowledged that he is one of the Members of Trinity Oaks, LLC, a California limited liability company, the sole member of AREI Colonnade 3, LLC, a Delaware limited liability company, and that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 3, LLC.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                                         _____

                                                         NOTARY PUBLIC

[Signatures continued on next page]

AREI COLONNADE 4, LLC,
a Delaware Limited Liability Company
by its Sole Member,
FREEDOM LAKES, LLC,
a California Limited Liability Company
by its Sole Manager

By:        _____(SEAL)
           Name:  Gregory W. Holcomb
           Title:    Manager

STATE OF
                                ss:
COUNTY OF

      On this, the            day of                    , 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared GREGORY W. HOLCOMB, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within instrument and acknowledged that he is the Manager of Freedom Lakes, LLC, a California limited liability company, the sole member of AREI Colonnade 4, LLC, a Delaware limited liability company, and that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 4, LLC.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[Signatures continued on next page]

27

AREI COLONNADE 5, LLC,
a Delaware Limited Liability Company
by its Sole Member,
The 1999 Snyder Family Revocable Trust
U/A/D 10/18/99

By: _____(SEAL)
      Name:  David W. Snyder
      Title:    Trustee

        _____(SEAL)
      Name:  Susan F. Snyder
      Title:    Trustee


STATE OF

                ss:

COUNTY OF


      On this, the          day of             , 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared DAVID W. SNYDER and SUSAN F. SNYDER, known to me (or satisfactorily proven) to be the individuals whose names are subscribed to the within instrument and acknowledged that they are the Trustees of The 1999 Snyder Family Revocable Trust U/A/D 10/18/99, the sole member of AREI Colonnade 5, LLC, a Delaware limited liability company, and that they, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 5, LLC.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                _____
                NOTARY PUBLIC


[Signatures continued on next page]

AREI COLONNADE 6, LLC,
a Delaware Limited Liability Company
by its Sole Members

By:    _____(SEAL)
       Name:  Ernest J. Ongaro


       _____(SEAL)
       Name:  Debra L. Ongaro



STATE OF
                                    ss:
COUNTY OF


      On this, the _____ day of _____, 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared ERNEST J. ONGARO and DEBRA L. ONGARO, known to me (or satisfactorily proven) to be the individuals whose names are subscribed to the within instrument and acknowledged that they are the sole members of AREI Colonnade 6, LLC, a Delaware limited liability company, and that they, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 6, LLC.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                         _____
                         NOTARY PUBLIC



[Signatures continued on next page]


29

AREI COLONNADE 7, LLC,
a Delaware Limited Liability Company
by its Sole Member

By: _____(SEAL)
    Name:  Jane W. Barelli


STATE OF
                          ss:
COUNTY OF


      On this, the _____ day of _____, 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared JANE W. BARELLI, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within instrument and acknowledged that she is the sole member of AREI Colonnade 7, LLC, a Delaware limited liability company, and that she, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 7, LLC.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
NOTARY PUBLIC


[Signatures continued on next page]

AREI COLONNADE 8, LLC,
a Delaware Limited Liability Company
by its Sole Member

By: _____(SEAL)
Name:  Oliana Policicchio

By: _____(SEAL)
Name:  Pia Brown, Agent under
Limited Power of Attorney


STATE OF

                                    ss:

COUNTY OF


On this, the          day of                    , 2009, before me, a Notary Public in and for the
State of _____, the undersigned officer, personally appeared PIA BROWN,
Agent under Limited Power of Attorney for Oliana Policicchio, known to me (or satisfactorily proven) to be
the individual whose name is subscribed to the within instrument and acknowledged that Oliana
Policicchio is the sole member of AREI Colonnade 8, LLC, a Delaware limited liability company, and that
she, being authorized to do so, executed the foregoing instrument for the purposes therein contained by
signing the name of AREI Colonnade 8, LLC.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
NOTARY PUBLIC


[Signatures continued on next page]


31

AREI COLONNADE 10, LLC,
a Delaware Limited Liability Company
by its Sole Member,
1984 Haedt Living Trust dated April 12, 1984

By: _____(SEAL)
Name:   James C. Haedt
Title:    Trustee

_____(SEAL)
Name:   Florence A. Haedt
Title:    Trustee

STATE OF

                                        ss:

COUNTY OF

      On this, the _____ day of _____, 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared JAMES C. HAEDT and FLORENCE A. HAEDT, known to me (or satisfactorily proven) to be the individuals whose names are subscribed to the within instrument and acknowledged that they are the Trustees of the 1984 Haedt Living Trust dated April 12, 1984, the sole member of AREI Colonnade 10, LLC, a Delaware limited liability company, and that they, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 10, LLC.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[Signatures continued on next page]

32

AREI COLONNADE 11, LLC,
a Delaware Limited Liability Company
by its Members,
DAVID & SUSAN SNYDER FAMILY
FOUNDATION CHARITABLE TRUST, Member

By: _____(SEAL)
    Name:  David W. Snyder
    Title:    Trustee

    _____(SEAL)
    Name:  Susan F. Snyder
    Title:    Trustee

and _____(SEAL)
    Name:  Ronald C. Ball
    Title:    Member

    _____(SEAL)
    Name:  Sally Ball
    Title:    Member


STATE OF

                              ss:

COUNTY OF


    On this, the          day of                  , 2009, before me, a Notary Public in and for the
State of _____, the undersigned officer, personally appeared DAVID W.
SNYDER and SUSAN F. SNYDER, known to me (or satisfactorily proven to be the individuals whose
names are subscribed to the within instrument and acknowledged that the are the Trustees of the David &
Susan Snyder Family Foundation Charitable Trust, one of the members of AREI Colonnade 11, LLC, a
Delaware limited liability company, and that they, being authorized to do so, executed the foregoing
instrument for the purposes therein contained by signing the name of AREI Colonnade 11, LLC.

    IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                              _____
                              NOTARY PUBLIC


[Notary Affidavit continued on next page]


                              33

STATE OF

                                       ss:

COUNTY OF

        On this, the         day of              , 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared RONALD C BALL and SALLY BALL, known to me (or satisfactorily proven to be the individuals whose names are subscribed to the within instrument and acknowledged that the are members of AREI COLONNADE 11, LLC, a Delaware limited liability company, and that they, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 11, LLC.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____

NOTARY PUBLIC

[Signatures continued on next page]

AREI COLONNADE 12, LLC,
a Delaware Limited Liability Company
by its Sole Member

By:     _____(SEAL)
        Name:   Ronald C. Ball


STATE OF
                            ss:
COUNTY OF


On this, the          day of              , 2009, before me, a Notary Public in and for the
State of _____, the undersigned officer, personally appeared RONALD C.
BALL, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within
instrument and acknowledged that he is the sole member of AREI Colonnade 12, LLC, a Delaware limited
liability company, and that he, being authorized to do so, executed the foregoing instrument for the
purposes therein contained by signing the name of AREI Colonnade 12, LLC.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                        _____
                        NOTARY PUBLIC


[Signatures continued on next page]

AREI COLONNADE 13, LLC,
a Delaware Limited Liability Company,
by its Sole Member,
FREEDOM LAKES, LLC,
a California Limited Liability Company
by its Sole Manager

By: _____(SEAL)
Name:  Gregory W. Holcomb
Title:    Manager

STATE OF

ss:

COUNTY OF

     On this, the _____ day of _____, 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared GREGORY W. HOLCOMB, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within instrument and acknowledged that he is the Manager of Freedom Lakes, LLC, a California Limited Liability Company, the sole member of AREI Colonnade 13, LLC, a Delaware limited liability company, and that he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 13, LLC.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
NOTARY PUBLIC


[Signatures continued on next page]

36

AREI COLONNADE 14, LLC,
a Delaware Limited Liability Company
by its Sole Member,

By: _____(SEAL)
Name:  Sally F. Haag
Title:    Member


STATE OF

                                    ss:

COUNTY OF


       On this, the          day of                    , 2009, before me, a Notary Public in and for the
State of _____, the undersigned officer, personally appeared SALLY F.
HAAG, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within
instrument and acknowledged that she is the sole member of AREI Colonnade 14, LLC, a Delaware
limited liability company, and that she, being authorized to do so, executed the foregoing instrument for
the purposes therein contained by signing the name of AREI Colonnade 14, LLC.

       IN WITNESS WHEREOF, I hereunto set my hand and official seal.


                                    _____

                                    NOTARY PUBLIC


[Signatures continued on next page]


37

AREI COLONNADE 15, LLC,
a Delaware Limited Liability Company
by its Sole Member,
THE CASE FAMILY TRUST DTD 1/23/1992

By: _____(SEAL)
      Name:  Gerald D. Case
      Title:    Trustee

By: _____(SEAL)
      Name:  Jermaine R. Case
      Title:    Trustee

STATE OF

                  ss:

COUNTY OF

     On this, the _____ day of _____, 2009, before me, a Notary Public in and for the
State of _____, the undersigned officer, personally appeared GERALD D.
CASE and JERMAINE R. CASE, known to me (or satisfactorily proven) to be the individuals whose names
are subscribed to the within instrument and acknowledged that they are the Trustees of The Case Family
Trust Dtd 1/23/1992, the sole member of AREI Colonnade 15, LLC, a Delaware limited liability company,
and that they, being authorized to do so, executed the foregoing instrument for the purposes therein
contained by signing the name of AREI Colonnade 15, LLC.

     IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                    _____
                                    NOTARY PUBLIC

[Signatures continued on next page]

38

AREI COLONNADE 16, LLC,
a Delaware Limited Liability Company
by its Sole Member,
THE KENNETH AND KAREN COHEN FAMILY
TRUST

By: _____(SEAL)
     Name:  Kenneth Cohen
     Title:    Trustee

By: _____(SEAL)
     Name:  Karen Cohen
     Title:    Trustee

STATE OF

                     ss:

COUNTY OF

      On this, the        day of            , 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared KENNETH COHEN and KAREN COHEN, known to me (or satisfactorily proven) to be the individuals whose names are subscribed to the within instrument and acknowledged that they are the Trustees of The Kenneth and Karen Cohen Family Trust, the sole member of AREI Colonnade 16, LLC, a Delaware limited liability company, and that they, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 16, LLC.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                          _____
                          NOTARY PUBLIC

[Signatures continued on next page]

AREI COLONNADE 18, LLC,
a Delaware Limited Liability Company
by its Sole Member,
THE SHELTON LIVING TRUST DTD 7/17/1991

By:  _____(SEAL)
     Name:   Debra Lynn Shelton
     Title:     Trustee


By:  _____(SEAL)
     Name:   Ralph Robertson Shelton
     Title:     Trustee


STATE OF

                                 ss:

COUNTY OF


        On this, the            day of                      , 2009, before me, a Notary Public in and for the
State of _____, the undersigned officer, personally appeared DEBRA LYNN
SHELTON and RALPH ROBERTSON SHELTON, known to me (or satisfactorily proven) to be the
individuals whose names are subscribed to the within instrument and acknowledged that they are the
Trustees of The Shelton Living Trust dtd 7/17/1991, the sole member of AREI Colonnade 18, LLC, a
Delaware limited liability company, and that they, being authorized to do so, executed the foregoing
instrument for the purposes therein contained by signing the name of AREI Colonnade 18, LLC.

        N WITNESS WHEREOF, I hereunto set my hand and official seal.


                                    _____
                                    NOTARY PUBLIC


[Signatures continued on next page]


                                    40

AREI COLONNADE 20, LLC,
a Delaware Limited Liability Company
by its Sole Member,
THE SUE MEYERS LIVING TRUST
DTD 5/20/05

By: _____(SEAL)
    Name:  Marilyn Sue Meyers
    Title:    Trustee

STATE OF

                ss:

COUNTY OF

      On this, the          day of            , 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared MARILYN SUE MEYERS, known to me (or satisfactorily proven) to be the individual who name is subscribed to the within instrument and acknowledged that she is the Trustee of The Sue Meyers Living Trust dtd 5/20/05, the sole member of AREI Colonnade 20, LLC, a Delaware limited liability company, and that she, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of AREI Colonnade 20, LLC.

      IN WITNESS WHEREOF, I hereunto set my hand and official seal.

                                 _____

                                 NOTARY PUBLIC

[Signatures continued on next page]

"Guarantor"                                     COLONNADE PROPERTY, LLC,
                                                a Delaware Limited Liability Company,

                            By:      _____(SEAL)
                                     Name:   Ronald C. Ball
                                     Title:    Member


                                     _____(SEAL)
                                     Name:   Kenneth Cohen
                                     Title:    Member


                                     _____(SEAL)
                                     Name:   Rudi Van Enoo
                                     Title:    Member


                                     _____(SEAL)
                                     Name:   Ernest J. Ongaro
                                     Title:    Member


                                     _____(SEAL)
                                     Name:   Susan F. Snyder
                                     Title:    Member




STATE OF
                              ss:
COUNTY OF


        On this, the            day of                    , 2009, before me, a Notary Public in and for the
State of _____, the undersigned officer, personally appeared RONALD C.
BALL, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within
instrument and acknowledged that he is one the Members of Colonnade Property, LLC, a Delaware
limited liability company, and he, being authorized to do so, executed the foregoing instrument for the
purposes therein contained by signing the name of Colonnade Property, LLC.

        IN WITNESS WHEREOF, I hereunto set my hand and official seal.



                                     _____
                                     NOTARY PUBLIC


[Notary Affidavits continued on next page]

                                          42

STATE OF

ss:

COUNTY OF


On this, the _____ day of _____, 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared KENNETH COHEN, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within instrument and acknowledged that he is one of the Members of Colonnade Property, LLC, a Delaware limited liability company, and he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of Colonnade Property, LLC.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
NOTARY PUBLIC




STATE OF

ss:

COUNTY OF


On this, the _____ day of _____, 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared RUDI VAN ENOO, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within instrument and acknowledged that he is one of the Members of Colonnade Property, LLC, a Delaware limited liability company, and he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of Colonnade Property, LLC.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.


_____
NOTARY PUBLIC




[Notary Affidavits continued on next page]


43

STATE OF

                                ss:

COUNTY OF

On this, the _____ day of _____, 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared ERNEST J. ONGARO, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within instrument and acknowledged that he is one of the Members of Colonnade Property, LLC, a Delaware limited liability company, and he, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of Colonnade Property, LLC.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

STATE OF

                                ss:

COUNTY OF

On this, the _____ day of _____, 2009, before me, a Notary Public in and for the State of _____, the undersigned officer, personally appeared SUSAN F. SNYDER, known to me (or satisfactorily proven) to be the individual whose name is subscribed to the within instrument and acknowledged that she is one of the Members of Colonnade Property, LLC, a Delaware limited liability company, and she, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of Colonnade Property, LLC.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
NOTARY PUBLIC

[Signatures continued on next page]

44

"Bank"                                    NATIONAL PENN BANK

                                 By:    _____ (SEAL)
                                        Name:   Jeffrey A. Glaush
                                        Title:    Vice President

[End of signatures]

Schedule A

| Owner | |
|---|---|
| AREI Colonnade 1, LLC<br>6336 Bryce Avenue<br>Orange, CA 92867 | |
| AREI Colonnade 2, LLC<br>5582 Carlile Court<br>Granite Bay, CA 95746 | |
| AREI Colonnade 3, LLC<br>6336 Bryce Avenue<br>Orange, CA 92867 | |
| AREI Colonnade 4, LLC<br>6336 Bryce Avenue<br>Orange, CA 92867 | |
| AREI Colonnade 5, LLC<br>3233 Delores Drive<br>San Ramon, CA 94583 | |
| AREI Colonnade 6, LLC<br>201 Walker Road<br>Petaluma, CA 94952 | |
| AREI Colonnade 7, LLC<br>59 Paso Hondo<br>Carmel Valley, CA 93924 | |
| AREI Colonnade 8, LLC<br>933 Butternut Court<br>Holland, MI 49424 | |
| AREI Colonnade 10, LLC<br>6201 Harwood Avenue<br>Oakland, CA 94618 | |
| AREI Colonnade 11, LLC<br>13454 Tierra Heights Road<br>Redding, CA 96003 | |
| AREI Colonnade 12, LLC<br>13454 Tierra Heights Road<br>Redding, CA 96003 | |
| AREI Colonnade 13, LLC<br>6336 Bryce Avenue<br>Orange, CA 92867 | |
| AREI Colonnade 14, LLC<br>2128 Grape Leaf Lane<br>Livermore, CA 94550 | |
| AREI Colonnade 15, LLC<br>10636 Elkhorn Drive<br>Stockton, CA 95209 | |
| AREI Colonnade 16, LLC<br>40610 N. Candlewick Lane<br>Anthem, AZ 85086 | |
| AREI Colonnade 18, LLC<br>341 Burgundy Drive<br>Healdsburg, CA 95448 | |

| | |
|---|---|
| AREI Colonnade 20, LLC<br>901 Brookside Drive<br>Eugene, OR 97405 | |